Thank you, Your Honor. Christine Arjun on behalf of Appellant Mohammad Khalil and I'd like to reserve five minutes for rebuttal of the time. Appellant Mohammad Khalil presented all of the facts to USCIS during his asylum proceedings around the year 2000, which pertained to his involvement with what was at the relevant time the U.S.-supported group Jamia-e-Islami. These facts were both necessarily and actually litigated during the asylum proceedings and the immigration judge ruled that Mr. Khalil was eligible for asylum. At the time of the relevant proceedings and at the time of his actual involvement with Jamia, Jamia was not a designated terrorist organization. USCIS now later improperly denied his application for adjustment of status based on that same involvement. We present that issue conclusion applies on the issue of whether Mr. Khalil was a member of or engaged in materially supported terrorist organization. Counsel, help me on a jurisdictional issue. Yes. It looks to me as though we have to have jurisdiction before we can make a decision about whether they made a permissible decision on the terrorism question. And my problem is with the statute saying any other decision of the attorney general, for which is specified under this subchapter to be in the discretion of the attorney general or the secretary of Homeland Security, that the court shall have no jurisdiction to review. It looks to me as though the decision that was made was, number one, you're a terrorist. Number two, even if you're not, and in the alternative, we exercise our discretion not to allow the adjustment of status. And I'm wondering whether that alternative decision based on discretion means we have no jurisdiction and we never get to decide whether – I see the strength of your argument on the terrorism. One strand is you already must have decided he wasn't a terrorist and the statute hasn't changed that much. And number two, it wouldn't make sense to say he was a terrorist since the United States furnished the weapons and I think furnished training to the particular group he was in so that they could shoot down Soviet helicopters that were bombing the villages and dropping exploding toys on the children, that sort of thing. So we can only get to that, though, if Congress lets us. And it looks to me like they didn't let us. What's the answer to that? Your Honor, I believe the answer to that is two things. I think for the same reason that this Court had jurisdiction in order to issue the ruling that it did in the Janjua v. Neufeld case, there is jurisdiction here to look at what the decision of whether there was collateral stop or whether there was issue of preclusion. I believe that that is reviewable. And second, I would say that, if I can relate back to a comment made in one of the cases earlier today, that we do have a district court order that we are appealing from the holding and the finding of the district court order. The appeal that we brought on the district court order is that the district court stated very clearly that the district court believed it had jurisdiction to review. This went through the court analysis and we believe that is correct. But also that the only reason that the district court did not find in favor of Mr. Khalil was based on its application of the Janjua v. Neufeld decision, which we believe the district court misapplied and I'm glad to get to. But we're appealing from that order that the district court issued. And again, the jurisdiction, we had not brought that up here on appeal. I understand the court at all times that Neufeld looked at jurisdiction, but the order that is presented before this court is the district court's order on whether Janjua precludes issue of preclusion. I don't remember Janjua addressing the jurisdiction stripping statute, did it? I don't recall, Your Honor, offhand if Janjua went. I don't believe there was an analysis of the jurisdiction stripping. I just believe that the court in Janjua did state that there was jurisdiction and it was reviewed on very much the same applicable statutes in referring to having jurisdiction under 28 U.S.C. 1291. Counsel, this may be a better question for Mr. Bichet, but I'm going to ask it of both of you. And it's a bit convoluted, so bear with me. I'll try and phrase it as clearly as I can because I have the same concern that Judge Kleinfeld does with regard to a discretionary call here. The district court did not seem to be persuaded that discretion prevented her from addressing the merits. But as I read the interplay between the statute, it seems that although Section 1159B generally gives the secretary the discretion to adjust the status of refugees, Section 1159C states that the provisions of paragraphs 4, 5, and 7A of Section 1182A will not be applicable to any alien seeking adjustment of status. And that the secretary may waive any other provision of such section other than paragraph 2C or subparagraph A, B, C, or E of paragraph 3. And Section 1182A, 3, A, B, and C are the terrorism related inadmissibility provisions that apply to Mr. Khalil. So the way I read the statutory interplay, the secretary doesn't have discretion to adjust status for him because he's statutorily ineligible by virtue of the fact that he is a terrorist under the statute. Your Honor, I do agree with that analysis, and I think you can see, in fact, in the earlier part of the record, the letters going back and forth with the notice of intent to deny and discussion of that language, which is with the notice of intent to deny and our response, which is found, and it will take me a minute to find the exact spot, but approximately, I believe it's ER 54 in that range. And in that, certainly, the government has claimed in other situations that it does not have the discretion to waive regarding the definition of terrorist activity or regarding acts that are found to be terrorist activity. And, again, that's what brings us back full circle, then, to whether the correct application occurred at the district court level of the Janjua v. Yugov opinion because, as Janjua held, the standards for determining terrorist activity and whether it bars admissibility are the same for asylum as they are for adjustment of status. And so that's why I believe this court does have jurisdiction. So you agree with my reading that even though the secretary said, in my discretion, I'm denying the request for adjustment, that the secretary didn't have the discretion at all because the statute doesn't give him that discretion? I agree. I agree, Your Honor, that that's not, it was a nice try, and I believe it was, quite frankly, a backup argument in case they lost on the collateral stuff. All right, then let me ask you the last part of the question, Mr. Bichet, pay close attention. Is there any other basis on which the secretary could exercise discretion and adjust staff? I will say that I believe that my opposing counsel probably would be glad to speak to that particular one. As to whether there could be any, I'm not aware of any, I don't see any other issues that have been, or aspects that have been brought up in this case, and that have been raised that would be appropriate in such a professional way. So I think, again, we circle back to the fact that the definition of terrorist activity has not changed, and is substantially the same even pre-Patriot Act and Real ID Act and post-Patriot Act and Real ID Act. But what do we do with the military training that is now applicable to Tier 3 terrorist groups that was not in existence at the time of the transfer? I'd be glad to address that, Your Honor. The issue there is that the language that has been added regarding military training, again, still lives back to the same standard because it's stated as military training on behalf of or in support of an organization that at the time the training was received was a terrorist organization. And again, we get back to that same definition, and that's at ER 84. Retroactively, we now know that it would have been designated as a terrorist organization, correct? There's, the question, I respectfully disagree with what you're putting out there, Your Honor. It'd be a Tier 3 terrorist organization. We have to look at what the activities were at the time. Again, at the time of Mr. Khalil's involvement, was this, was Jemaiat considered a terrorist organization when Jemaiat had met the test, which is consistent throughout all versions of the standard, the definition for engaging in terrorist activity or what a terrorist organization is. And at the time of his involvement, which was in the 80s and up until 1995, Jemaiat would not have met that test. Jemaiat was not a terrorist organization. As Justice Kleinfeld pointed out. Ms. Shump, I agree with Judge Kleinfeld. To me, Kleinfeld is in a very sympathetic position. I don't understand why somebody, I mean, he was our terrorist. He was our guy. I'll go with that. He was our guy. And, you know, now Congress is saying, well, maybe then, but retroactively, not now. And I don't know how to get around Congress saying that the statutory change is applicable before, now, and after. I agree, Your Honor. And I believe that the statutory change, again, just change the wrapping and the labeling again. It does not change the underlying test of what is terrorist activity. And when you look at the definition of terrorist activity, you can't sit here in 2021 and say, well, now we think that the activity in 1980 through 1995 was considered terrorist activity. And now we, in hindsight, don't like it. Look at what it was considered at the time that he had activity. I'm not sure of that. Because the statutory change says that it's retroactive. And the doctrine on retroactivity in the non-criminal context is the statute is presumptively not retroactive unless it says that it is. But here it says that it is. And, Your Honor, I believe that's where we look at the issue preclusion. This, again, we believe was actively litigated, actually litigated, and necessarily litigated at the asylum stage. Therefore, issue preclusion would apply. Military training was not a provision that was a component of terrorist activities at that time. That only came into existence later when Congress added that. And I think it was either the Real ID Act or the Patriot Act, I can't remember which. But then made it expressly retroactive at the time of your client's activity. Again, though, it still relies on the same definition of terrorist organization or terrorist activity that exists consistently throughout. Those definitions were not substantially revised. And what I believe we need to do is either, as we set forth in our briefs, and I don't want to run out of time here, so I do want to make my final points here before hearing from present counsel, that we believe that we have established that this issue was raised and necessarily litigated and actually litigated, regarding whether he was engaged in terrorist activity or on behalf of a terrorist organization. That occurred at the asylum stage. And even if it's not, if by chance it's not clear to this court whether that happened, then as we represented to the district court and requested of the district court, then we would like the opportunity to obtain, which we have requested but don't have yet, the transcript from the asylum proceedings. Because as the court knows, those proceedings are recorded but not transcribed. Counsel, counsel, let me ask a question. I'm sorry? If the categorization of military training as applicable to what we now know to be a tier three terrorist organization of two or more individuals engaging in violent acts didn't exist, the transcript couldn't possibly reveal any discussion because it wasn't part of the law at the time. Your Honor, I believe that the transcript certainly won't reveal the term tier three. Obviously, that would not have been brought up. But again, the standards for a terrorist activity and terrorist organization and engaging in terrorist activity and terrorist organization are the same. And this court's holding in Janjua does not say. But the immigration judge would not have been able to grant him asylum if the state of the law had been what the law now retroactively has declared to be. I believe. I mean, I just don't see how pulling up the transcript of the hearing is going to make any difference at all. Your Honor, on that, I would like to point again to this court's holding in the Janjua case. And in the Janjua case, this court found not that there was no possibility that something that came subsequent to the Patriot Act and the Real ID Act could ever have issued preclusion. But this court in Janjua found that in that instance, the issue of whether he had engaged in terrorist activity had not, in fact, been presented and actually litigated. That did not say as a blanket rule that it could not be. And that's why I believe that the facts here are more comparable to Paolo V. Holder, which this court did discuss in Janjua and simply found not to apply to the facts of that case but did not say was inconsistent with this court's ruling in the Janjua v. North Carolina case. All right. So let's do this. We'll give Ms. Jump three minutes for rebuttal. And let's hear from Mr. Bechet. Good afternoon, Your Honors. May it please the Court. Assistant Justice Attorney Timothy Bechet on behalf of the defendants and appellees. In addition to denying Plaintiff Appellant Muhammad Khalil's request to adjust status because he was inadmissible, the Secretary of Homeland Security alternatively denied that as a matter of discretion. Under 8 U.S.C. By what authority does the Secretary have discretion? You heard my questions to Ms. Jump. And do you have any other ground besides the fact that he's statutorily ineligible and therefore the Secretary has no discretion? Yes, Your Honor. And the response to that is I don't believe we get to Section C, 1159C, to answer this discretion question. The basis for adjusting the status of an asylee to lawful permanent residence is laid out in 1159B. And under B, there are five requirements that must be met. One of those is that the alien is admissible at the time that the examination for adjustment is made. And here the Secretary said you are not satisfied as a partner. Mr. Khalil is inadmissible on terrorism-related grounds. Therefore, he does not meet the requirements that must be fulfilled before the Secretary can exercise discretion. But don't we have to look at C in order to determine what B covers? Because C acts as a carve-out for certain types of applicants who are deemed ineligible for adjustment of status, even though they may be asylee. Correct. And, Your Honor, the reason I don't think we need to address C is because Mr. Khalil's argument is that the Secretary cannot find him inadmissible on terrorism-related grounds. So the Secretary, in rejecting the application, said you're inadmissible on terrorism-related grounds, but even if you were not, in other words, even if you had satisfied that requirement and were admissible at the time of the examination, the Secretary would then opt to deny the application as a matter of discretion provided under that statute. I couldn't understand. Even if you were not, I'm exercising discretion. I had trouble reading that as anything other than a meaningless formula because there was no explanation of why the Secretary was saying as a matter of discretion you don't get relief. I mean, as I understand it, it's uncontested. When the kid was 18, he fought in this group that, with the support and urging of the United States, was fighting the communists in Afghanistan with American-supplied weapons. And now, what is it, almost 20 years later, he's established in the United States with a family, and he gets denied his application as a matter of discretion. Well, unless I know why, I don't understand what the discretionary exercise is. What's the Secretary talking about? Your Honor, there are two places I think we need to look to understand the exercise of discretion, the alternative exercise of discretion. What the Secretary says is the only reason that he gives for exercising his discretion is you're a terrorist, but that just circles back to the other issue. If you're a terrorist, you're inadmissible. Is there anything else? Well, Your Honor, I don't know if it's – I agree it comes across as a little bit circular, but you see in the decision specifically at page 89 of the record that the Secretary says, even though you're inadmissible for a discretionary adjustment, because I find you inadmissible, even if I had not found you inadmissible, I have weighed the positive factors and find that those are outweighed by his engagement in terrorist activity, and therefore if it got to the point where it was to the Secretary's discretion, which it would. Yeah, that's what he says here. He says the nearly 18 years you've resided in the United States and the fact that you have family members who reside here are indeed positive factors. However, after careful review of all the facts, USCIS has determined you do not warrant adjustment of status as a matter of discretion, even if you were statutorily qualified, because the positive factors are outweighed by your use of a dangerous weapon when you used rocket launchers in combat as a mujahideen fighter, which just circles back to the first issue that you're a terrorist. That's why I'm asking, is there any other exercise of discretion factor that the Secretary mentions? There aren't any other factors aside from, as you read Judge Kleinfield's book, the positive factors that the Secretary identifies and the countervailing negative factors. But if you look at the statute at 1159B, this decision of whether to adjust status is by statute a discretionary decision. So when the Secretary makes the decision, he or she is exercising the discretion that has been afforded to him or her by Congress. So the decision is inherently discretionary. And again, to address Judge Tolman's question, the discretionary decision comes after certain criteria are met. And in Mr. Khalil's case, the Secretary determined those criteria were not met. Let me jump in and ask the question the other way. So you're telling us that if someone is found to be a terrorist, that the Secretary can still step in and say, yeah, you're a terrorist, but that's okay. You can get it. No, that is not what I'm saying. And that, I think, is more closely related to Judge Tolman's question about 1159C and the waiver of certain grounds of inadmissibility, which is not applicable to the terrorism grounds as has been pointed out. But if the Secretary— I just don't see how you can have a discretionary call when the statute says you can't grant relief. That's not discretion. The Secretary is bound by the fact that Congress has said, if we find that you engaged in terrorist activities, Secretary, you cannot adjust his status. That's not discretion. That's complying with the law. The law sets the standard. Correct, Your Honor. But that is why the Secretary could not have waived Mr. Cleo's— the finding that Mr. Cleo was inadmissible for terrorism. To put it another way, Counsel, there's no discretion that the Secretary can exercise once the determination is made that the petitioner has engaged in these types of terrorist activities. I agree, Your Honor. I don't understand. I understand that the Secretary tried to double-barrel it by saying, well, even if he wasn't statutorily ineligible as a terrorist, I would still, in the exercise of my discretion, deny. But he doesn't have any discretion to exercise. I mean, it's kind of a meaningless statement. I mean, Your Honor, the Secretary can make alternative decisions. I think we're conflating the waiver of terrorism-related grounds of inadmissibility and the discretionary decision of whether to adjust status. Your Honor is correct that once the Secretary determined that Mr. Cleo was ineligible, the Secretary then doesn't get to that point in 1159B of having the discretion to adjust his status. But that is why the Secretary said, in the alternative, if for some reason there's a problem with the finding that you are inadmissible on terrorism-related grounds, even if we got to the point where I could exercise discretion afforded by 1159B, the Secretary would look at the positive factors laid out in the decision, look at the countervailing factors, and would deny the application. The alternative, deciding on the alternative, is something this Court has recognized on Ciflu and the Hosseini v. Gonzales case. In that case, and in other cases— Counsel, let me see if I understand your argument. Are you saying then that just because somebody has asylum, they have not been admitted to the— that it is only when he requests an adjustment of status to lawful permanent residence that he is seeking admission? Is that your argument? That is not my argument. Your Honor, I think my argument with regard to your question is that 1159C is a separate form of relief that is not at issue in this case. That is a waiver of certain admissibility grounds that we all agree Mr. Cleo is not eligible for because of the specific grounds on which he was found to be inadmissible. Then why does the provision specifically address an alien seeking adjustment of status under this section? Let me see if I can address this more broadly. As we discussed, one of the requirements for the Secretary to be able to exercise the discretion to adjust status is that an alien is admissible at the time of the examination for adjustment. That is in 1159B-5. There are in 8 U.S.C. 1182 pages and pages and pages of grounds for inadmissibility. For many of those, the Secretary could say, alien, I find you inadmissible on non-terrorism grounds, but I am exercising my discretion to waive that. Now you get back to the point where you have satisfied all of the 1159B requirements and now the Secretary can exercise discretion to adjust status. I am with you so far. I understand all that. But why doesn't the three terrorism, maybe there are four, A, B, and C under 1182A3, why don't those operate as a trump card in which the Secretary is told, you don't have any discretion to waive if the alien meets one of these three subsections? That is correct. The Secretary does not have discretion to waive those grounds of inadmissibility. But we are not talking about a request for waiver of grounds of inadmissibility. We are talking about a request to adjust status. And the Secretary said, you don't meet the requirements of 1159B because I find you inadmissible. Even if you met the requirements of 1159B and it was up to my discretion, I would exercise that discretion to deny because the negative factors outweigh the positive factors. So that is why it is an alternative grounds for denial. Even if, that is assuming that there is some problem or some reason why the terrorism-related inadmissibility would be ineffective. So when we are talking about the alternative discretionary denial, at that point we are assuming that we are no longer worried about the terrorism-related inadmissibility. Counsel, let me ask you something that is separate from this that worries me. Obviously I am worried because, as Judge Tallman pointed out, this is a sympathetic case for the petitioner. I am also worried that, boy, if our adversaries got hold of this, it would be great publicity for them to say, if you fight for the United States at the United States' request with weapons furnished by the United States, the United States will betray you. It will treat you as a terrorist. Is there any point in this case to something we did in another case of remanding for mediation or delaying decision for mediation? Is there any point to mediation? It seems to me we are constantly using cat's paws, as most big countries do, to fight our battles for us. Gosh, what a message to people like the Montagnards in Vietnam years ago and the Kurds and the anti-communists in Afghanistan in the 70s and 80s. What a message. Is there any point to mediation? Does anyone bring up these policy concerns when they are deciding whether to make a determination and what determination to make, and I guess subsidiary to that, is does he keep his asylum or does he get sent back to Afghanistan now? I will address those in reverse because the first one is easier. As was laid out in the decision, this denial of the adjustment status has no impact on his status as an asylee. He is still an asylee. He is not in removal proceedings. That does not change. To address the, I think, thorier but still fair question about what message to send to our allies, I can't speak to everything that goes into the Secretary of Homeland Security's reasoning or USCIS's reasoning in making these decisions, but Congress is plainly aware of the impact that these statutes and their expressed retroactivity has. As is laid out, again, in the decision, page 88 of the record, Mr. Kaleel raised that exact argument and USCIS responded by saying Congress knows it has that impact because Congress has gone back and made carve-outs for certain groups. I believe, like you mentioned, Judge Kleinfeld, some of the groups we worked with in Vietnam. Congress has gone back and said, okay, these provisions do not apply to those groups for whatever reasons it is that motivates Congress to make laws. So I definitely think Congress is aware of the impact of these statutes and has shown an ability to address that when it feels it's appropriate or necessary. But he also had a question about mediation. Your Honor, that's not something I've discussed with my client. I'm not going to ask, but based on what discussion we've had and what there is in the decision, taking that step of saying we would deny as a matter of discretion, I think indicates that mediation is not something that USCIS would be interested in. All right, well, we can't make you do that if you don't want to. All right, well, very good. Thank you for your argument today, Mr. Pache. Ms. Jump, I think I gave you a few minutes. Make sure your volume is on, or your sound is on. Sorry about that. I muted to try to not be disruptive. No problem. Go ahead. All right, Your Honor, thank you very much. And I would say, first of all, that looking at the language, as was discussed earlier where the discretion is referenced, that is, first of all, that is discretion to adjust the status to lawful permanent residence for an alien-granted asylum. And, again, as already discussed, that's unless they're deemed to be having engaged in terrorist activity. As this Court already pointed out, or as Your Honor has already pointed out previously, there is an exclusion there which says, except as otherwise provided under Subsection C. Basically, what opposing counsel's argument leads to, what the government's argument would lead to, is if we take that to say that we can find somebody to, we can apply discretion, and if discretion is not appealable or discretion is not reviewable on adjustment of status, because we decided to issue discretion, it completely negates all of the factors which are previously set up by Congress. I can't imagine that that's what Congress intended and it's not consistent with the prior holdings of this Court. Again, also, 8 U.S.C. 1182 also says that you look at the organization at the time of the association. So even if we're looking backward, even if we're looking retroactively, we're looking at the time of the association. And as we discussed earlier, at the time of the association, he was our guy. And opposing counsel's argument that there could be discretion used, I believe one of the comments made earlier was that the government could use discretion on any basis other than terrorism. They cite to terrorists in the notice of intent and in the decision. They say we're exercising discretion because of terrorist activities. That's the thing that they say outweighs all of the other factors, is because we're finding we could be a terrorist. They're not saying it because of anything other than terrorism. They're trying to do a loop around to get back to, well, if we can't do it because of this, because it was already decided at the asylum level, if we're not allowed to look back at it, if we're not allowed to exercise discretion under Part C, then we're going to go ahead and just, you know, exercise discretion anyway in a non-revealable form and pull that word terrorism right back into it in a way that we think we can do it or not. And that cannot be what Congress is going to do. All right. Thank you very much, Jeff. Thank you both for your briefing and argument in this case. It was very helpful to the panel. This matter is submitted, and this particular panel is adjourned. Thank you, Your Honor. Thank you.
judges: Kleinfeld, Tallman, Owens